639 So.2d 229 (1994)
Linda Forte MEANY
v.
Lawrence G. MEANY.
No. 94-C-0251.
Supreme Court of Louisiana.
July 5, 1994.
Rehearing Denied September 15, 1994.
*230 Raymond Charles Burkart, Jr., Kendra LaNata Van Dalen, New Orleans, for applicant.
Anthony J. Clesi, Jr., Lynn H. Frank, Ward & Clesi, John Neely Kennedy, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, John Yeatman Kennedy, II, Metairie, for respondent.
CALOGERO, Chief Justice.[*]
Claiming that her former husband negligently transmitted to her the herpes simplex virus type 2, genital herpes, as well as the human papilloma virus which causes venereal warts, plaintiff Linda Forte Meany was awarded damages by the district court. The court of appeal, concluding that plaintiff had not shown defendant's actual or constructive knowledge of his condition, reversed. Based on our review of the record, we find that there was adequate evidence for this jury to reasonably conclude that defendant knew or should have known that he had contracted a *231 sexually transmitted disease, with which he then negligently infected his wife.
Linda Forte and Lawrence Meany met in November of 1973 and were married on May 25, 1974. During the three years prior to their marriage, Mrs. Meany dated three other men with whom she maintained a sexual relationship. The man whom she dated from March of 1973 through September of 1973, a period which overlapped her relationship with another of the three, was examined and tested prior to this trial for both genital herpes and venereal warts.
The results from the blood test for the herpes virus and from the urethroscope procedure to find venereal warts were negative.
From May 25, 1974 until October 2, 1980, the Meanys lived together, and two children were born of the marriage. Paul was born on July 2, 1976, and Lauren was born on October 8, 1978. Both were delivered by cesarean section, and Lauren's delivery followed fifteen hours of labor. There is no report that any particular symptoms or complications accompanied or followed either of these births.
In October of 1980, the couple physically separated. When they reconciled in June of 1981, Lawrence Meany acknowledged to his wife that he had engaged in an extramarital affair during their separation. Since Mrs. Meany "was upset about it," Mr. Meany noted that "she didn't really particularly question or go into detail." She learned for the first time at Mr. Meany's deposition before trial that, in fact, he had engaged in sexual relationships with four or five unnamed women during this period. With regard to his efforts to practice safe sex, Mr. Meany asserted at trial that, "[t]o the best of [his] knowledge," if he "had met someone and ... had dated a week or two weeks and [he] didn't really know the person that ... [he] would use protection, condoms."[1]
Although the Meanys resumed living together in June of 1981, they did not resume an active sexual relationship. According to Mr. Meany, they "didn't have sex like honeymooners, frequently," and, according to Mrs. Meany, the couple's only sexual contact occurred on March 1, 1985, the date on which their third child was conceived. Despite the couple's conviction at this time that their religious beliefs would enable Mrs. Meany to have a safe vaginal delivery, the child, Jessica, was delivered by an emergency cesarean section on December 10, 1985, after three days of labor.
As soon as the epidural wore off, Mrs. Meany noticed a "scratch," "irritation" or "rash" in the genital area. She attributed it to the insertion of a catheter, and did not direct the doctor's attention to the area. However, she testified that the irritation would appear with each menstrual cycle, she mentioned it to her husband, and she eventually sought medical attention on October 20, 1987. At this doctor's appointment, the "scratch" was not evident, and the doctor treated her for a yeast infection. A diagnostic test for yeast infection was negative and, not surprisingly, a prescribed cream had no discernible effect. Ultimately, the irritation just ran its usual course and temporarily disappeared.
On May 31, 1988, Mrs. Meany filed a petition which sought a legal separation from her husband. A judgment of divorce, which was based on Mr. Meany's adultery, and which found Mrs. Meany free from fault, was granted on March 24, 1990.
Shortly after the separation, Mrs. Meany had consulted a physician to discuss a tubal ligation as well as an abdominoplasty, a surgical procedure commonly referred to as a "tummy tuck." At that time, the physician suspected that she was infected with the herpes simplex virus type 2 and ordered a culture. As soon as the doctor's initial diagnosis was confirmed, he prescribed Zovirax, an inhibitor of the herpes virus, and instructed Mrs. Meany to take the medication five times a day for a period of five or six days. In addition she was cautioned that herpes is contagious on sexual contact. Therefore, her treating physician testified that he informed her that the use of condoms would provide *232 protection and that the limitation of sexual activity during an outbreak of symptoms would avoid spreading the disease.[2]
When Mrs. Meany received the positive diagnosis of genital herpes on June 25, 1988, she immediately telephoned her husband. According to her testimony, Mr. Meany expressed disbelief that she had contracted the virus, but told her that "he had had a drippage at one time, and he had seen a doctor in LaPlace." Mrs. Meany stated that he refused to elaborate on this statement when she demanded more specific information. In November of 1989, it was determined that Mrs. Meany had contracted another sexually transmitted disease, the human papilloma virus, a virus that causes venereal warts and is associated with increased cancer risks. An outpatient procedure involving laser surgery was performed at a cost of $21,324 to remove the warts at Doctors Hospital, shortly after the diagnosis. Testimony equated the pain accompanying the procedure with sitting on a hot stove.
Although Mr. Meany contends that he has never had any outward symptoms or sign of herpes and was therefore unaware of his infection, a blood test, immunoglobulin G test for herpes, performed at his request, was positive for herpes simplex virus types 1 and 2.[3] According to his physician, these lab results indicate that Mr. Meany has been infected with the herpes virus. An external exam only did not indicate the presence of venereal warts, but medical testimony indicated that it is necessary to look up into the urethra to rule out the presence of the human papilloma virus.
Expert testimony at trial indicated that "herpes presents itself as an irritation, a burning and some pain, like fever blisters." In fact, "[a] herpes lesion is virtually the same thing on the genitalia as a fever blister is around the mouth or nose or chin." The actual herpes lesion, according to testimony, begins as a small blister, which may vary from the size of a pinhead to a grain of corn, and which is surrounded by a slightly larger area of inflammation. Since the blister almost always breaks, the underlying skin is moist. The lesion is very tender and is particularly sensitive if splattered with urine, a characteristic which permits a tentative diagnosis, even without a physical examination. The original outbreak, which usually occurs from two or three days to a week or ten days after exposure, may include "an area half as big as the palm of ... [a] hand with multiple blisters and redness on it, and these blisters would all lose their tops and become little ulcers." Typically, the original outbreak is more severe and striking than the subsequent, recurrent ones. Nevertheless, medical testimony indicated that it is possible to have the recurrent type lesions without ever having had the original, typical herpes outbreak. Although the experts testified that the outbreaks usually become less frequent as time goes by, the disease is incurable. In Mrs. Meany's case, she contends that she has outbreaks of the virus "on the average of every other month," and she correlates the attacks with emotional stress.
In addition to physical problems associated with the infections, Mrs. Meany has also suffered psychological problems which have necessitated both individual counseling and some participation in a herpes support group, each of which is ongoing. Testimony indicated her feelings of frustration, bitterness, rejection and anger, especially when the physical symptoms of herpes manifest themselves. According to her counselor at the time of trial, the infection affected Mrs. Meany's feelings about herself, her body, her sexuality, and her future. Experiencing a great *233 deal of anger and sadness about what had happened, she reportedly felt hopeless about what her life was going to be after the divorce. The counselor concluded that Mrs. Meaning would only be ready to terminate therapy when she felt able to get involved in another relationship and felt more confident about herself and her sexuality.
After being instructed, among other things, that "the inability of a defendant to know or prevent a risk precludes a finding of negligence," the jury indicated by answer to written interrogatories that Lawrence Meany was negligent, that his negligence was the cause of Linda Forte Meany's injuries, and that Mrs. Meany was not negligent. Therefore, the jury awarded $125,000.00 in damages to compensate Mrs. Meany for pain and suffering, mental anguish, permanent disability, medical expenses, and loss of society and enjoyment of life. On appeal, however, the trial court judgment was reversed, 631 So.2d 14. The Court of Appeal reasoned that "[a] defendant who is completely unaware of his own infection with sexually-transmitted diseases cannot reasonably be held to a duty either to warn his partners about or protect his partners from transmission of those diseases." Concluding that the record lacked evidence that a "drippage" is a symptom of genital herpes or of venereal warts, the court of appeal asserted that Mrs. Meany failed to carry her burden of proof that Mr. Meany had actual or constructive knowledge that he was infected with venereal diseases at the time of his last sexual contact with his ex-wife.
La.Civ.Code art. 2315 (West Supp.1994) provides in pertinent part that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." If the act involves the failure to exercise reasonable care, it is deemed negligence. The four elements of negligence include duty, breach, a causal relationship between the defendant's alleged negligent act and the plaintiff's injuries (which includes both cause in fact and legal cause), and damages. Thomas C. Galligan, Jr., A Primer on the Patterns of Negligence, 53 La.L.Rev. 1509, 1510 (1993) (citing William L. Prosser et al., Cases and Materials on Torts 136 (8th ed. 1988)).
In order to prevail on a negligence claim, a plaintiff has the burden of proving that (1) the defendant had a duty to conform his conduct to a specific standard, (2) the defendant failed to do so, (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries, (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries, and (5) actual damages to the plaintiff occurred. Roberts v. Benoit, 605 So.2d 1032, 1051 (La.1991) (on rehearing) (citing Fowler v. Roberts, 556 So.2d 1, 4 (La.1989)). A threshold issue then in any negligence action is whether the defendant owed the plaintiff a duty. This issue is a legal question for the court to decide.
When a plaintiff articulates a general rule or principle of law that protects his interests, it is necessary for the court to determine whether the rule is intended to protect him from the particular harm alleged, an inquiry which involves both the duty and causation elements of the negligence formulation. The court must make a policy determination in light of the unique facts of the case. Thus, the duty-risk analysis requires the court to take into account the conduct of each party as well as the particular circumstances of the case. Socorro v. City of New Orleans, 579 So.2d 931, 938 (La.1991). In determining whether to impose a duty in a particular situation, the court may consider various moral, social, and economic factors, including whether the imposition of a duty would result in an unmanageable flow of litigation; the ease of association between the plaintiff's harm and the defendant's conduct; the economic impact on society as well as the economic impact on similarly situated parties; the nature of the defendant's activity; moral considerations, particularly victim fault; and precedent as well as the direction in which society and its institutions are evolving. Pitre v. Opelousas General Hospital, 530 So.2d 1151, 1161 (La.1988); William E. Crow, The Anatomy of a Tort, 22 Loy.L.Rev. 903 (1976).
Once the court finds that a duty exists, the trier of fact must decide if that *234 duty has been violated by the defendant. In a negligence action, the jury must decide whether defendant's conduct conformed to the standard of conduct of a reasonable man under like circumstances. Seals v. Morris, 410 So.2d 715, 718 (La.1982) (on rehearing). Various factors considered in the "reasonable man" analysis include the likelihood of the harm; the gravity of the harm; the burden of prevention; and the social utility of the defendant's conduct. Crow, supra, at 912. And, under traditional negligence concepts, the duty to take reasonable steps to protect against injurious consequences resulting from the risk is based on the defendant's actual or constructive knowledge. Kent v. Gulf States Utilities Co., 418 So.2d 493, 497 (La.1982).
Nationwide, courts have traditionally imposed liability for communication of harmful diseases. Berner v. Caldwell, 543 So.2d 686, 688 (Ala.1989) (citing Crim v. International Harvester Co., 646 F.2d 161 (5th Cir. 1981) (valley fever); Smith v. Baker, 20 F. 709 (C.C.S.D.N.Y.1884) (whooping cough); Capelouto v. Kaiser Found. Hosp., 7 Cal.3d 889, 500 P.2d 880, 103 Cal.Rptr. 856 (1972) (salmonellosis); Hofmann v. Blackmon, 241 So.2d 752 (Fla.Dist.Ct.App.1970) (tuberculosis); Earle v. Kuklo, 26 N.J.Super. 471, 98 A.2d 107 (App.Div.1953) (tuberculosis); Jones v. Stanko, 118 Ohio St. 147, 160 N.E. 456 (1928) (smallpox); Franklin v. Butcher, 144 Mo.App. 660, 129 S.W. 428 (1910) (smallpox); Hewett v. Woman's Hospital Aid Ass'n., 73 N.H. 556, 64 A. 190 (1906) (diphtheria); Edwards v. Lamb, 69 N.H. 599, 45 A. 480 (1899) (sepsis); Kliegel v. Aitken, 94 Wis. 432, 69 N.W. 67 (1896) (typhoid); Minor v. Sharon, 112 Mass. 477 (1873) (smallpox)). The duty has been applied to both the individual who is aware of his or her infection and to third parties, such as the employer in Crim v. International Harvester and the landlord in Earle v. Kuklo, who were both aware of and in a position to prevent the spread of the disease. Note, Interspousal Tort Liability for Infliction of a Sexually Transmitted Disease, 29 J.Fam.L. 519, 520-1 (1990-1). Such liability imposes a great burden on the diseased person since abstinence from all social contact is required in order to prevent infection. Karp & Karp, supra note 2, at 89-90. However, it is clear that society's interest in protecting the public health, the severity of the risk that others would be infected with diseases such as tuberculosis, diphtheria, typhoid, or smallpox, and the highly contagious nature of the diseases justify the imposition of this burden on the diseased person.
More recently, liability has been extended to the communication of sexually transmitted diseases. Furthermore, all states which have considered the issue have concluded that one spouse is liable to the other in tort for transmitting herpes. Robert G. Spector, Tort Liability For Transmission Of A Venereal Disease, 14 No. 1 FairShare 23 (1994). In those cases the duty of the infected party, who knows, should know, or should suspect that he or she is infected with a sexually transmitted disease is either to abstain from sexual contact with others or, at least, to warn others of the infection prior to having contact with them. Berner v. Caldwell, 543 So.2d at 689. While courts have generally required that the defendant have actual or imputed knowledge of his or her disease before liability may be assessed, a legal duty has nonetheless been imposed in a situation where a person is shown to have lacked medical confirmation that the disease had been contracted. M.M.D. v. B.L.G., 467 N.W.2d 645, 647 (Minn.App.1991). Certainly, the presence of open, oozing genital sores indicates a serious problem, whether or not a diagnosis exists. If a defendant has experienced an attack or has sought medical advice concerning such symptoms, he would likely be deemed by the courts to possess the requisite knowledge, whether or not an actual diagnosis could be proved. Karp & Karp, supra note 2, at 95. Furthermore, a defendant was not permitted to avoid liability for transmitting a sexually contagious disease because he believed that transmission was not possible as long as he was symptom free. Doe v. Roe, 218 Cal.App.3d 1538, 267 Cal.Rptr. 564 (1990). In balancing policy considerations, the court noted that the state's policy of preventing the spread of venereal disease is great and the burden of warning a prospective sex partner is slight, even if there is only *235 a slight degree of foreseeability that plaintiff's injury would occur. Id. 267 Cal.Rptr. at 567.
Although liability has been extended to the communication of sexually transmitted diseases, courts have not adopted a policy of strict liability, or negligence per se, when the transmission of venereal disease has been statutorily prohibited. The violation of a legislative enactment commanding or prohibiting a specific act to ensure the safety of others arguably constitutes negligence per se. According to the court in Mussivand v. David, 45 Ohio St.3d 314, 544 N.E.2d 265, 271-2 (1989), however, since the exposure of others to a dangerous disease could depend on the type of disease and the method of transmission, the relevant Ohio statute (or any other state statute concerning this issue) merely states a rule of conduct. It does not proscribe a specific act.
This Court recognizes, as a matter of public policy, that each person has a duty to use reasonable care to prevent the spread of harmful communicable diseases, including sexually transmitted diseases.[4] The Legislature has incorporated this duty at La.Rev. Stat.Ann. § 40:1062 (West 1992), which provides as follows:
It is unlawful for any person to inoculate or infect another person in any manner with a venereal disease or to do any act which will expose another to inoculation or infection with a venereal disease.
We believe that this rule does not impose strict liability on an infected party who transmits a venereal disease. As recognized by the court of appeal, the rule is intended to protect a plaintiff from infection by a defendant or any infected party who knows or should know that he or she is infected with a sexually transmitted disease. The duty of the infected party is either to abstain from sexual contact with others or to warn others of the infection before sexual contact.
Where we disagree with the court of appeal is in its evaluation of the evidence before it. This record contained enough evidence from which a jury could reasonably conclude that Mr. Meany knew, should have known, or should have suspected that he was putting his wife at risk of venereal disease by sexual contact. Undisputed evidence indicated that Mr. Meany is infected with the herpes simplex virus type 2 and that he had contact with multiple sexual partners in 1980 and 1981 during a period of separation from his wife. In contrast, there was no evidence that Mrs. Meany had had any sexual partners other than her husband since their marriage in 1974 and one of three pre-marital partners was tested shortly before the trial of this matter for both the herpes and human papilloma viruses and was found free of the diseases. Expert testimony informed the jury that genital herpes is spread by sexual contact and is characterized by blisters which break and release a fluid carrying the herpes virus. And the jury members may also have been aware that the symptoms of the initial herpes attack (which affects an estimated 300,000 people each year) includes a vaginal or urethral discharge. Coupled with this is the testimony of Mrs. Meany, which although disputed in part, was obviously accepted by the jury. Mrs. Meany testified that her first symptoms of infection with the herpes virus occurred after reconciliation with her husband, who had engaged in multiple extramarital sexual contacts for which he could not testify with certainty that protective devices were used. Furthermore, the jury heard Mrs. Meany's testimony that, when she confronted her former husband with her diagnosis, his initial reaction was a disclosure that he had experienced a problem with "drippage" for which he sought medical attention. Although the description of the problem does not specifically comport with the expert testimony concerning symptoms of either genital herpes or venereal warts (nevertheless, the term "drippage" could be equated with testimony before the jury concerning the moisture associated with the broken herpes blisters), defendant's admission that he sought medical attention was in response to plaintiff's *236 revealing that she had been diagnosed with genital herpes. The fact that this "drippage" concerned defendant enough to seek medical advice suggests that he knew or suspected that he possibly had some kind of venereal disease. And, defendant's expression of surprise at his wife's developing an infection need not have been interpreted by the jury as an indication that he did not know of his infection, but just the reverse. The limited sexual contact between this married couple may have been seen by the jury as reflecting an abstinence on Mr. Meany's part either to conceal overt symptoms of a herpes infection, or to limit his wife's continued exposure to the virus. Further, his surprise at her infection could have been prompted by an assumption on his part that the disease would not likely have been transmitted when he was asymptomatic nor in light of the very limited sexual contact between defendant and his wife.
The jury heard the testimony and had the best opportunity to evaluate it. The evidence supports their conclusion that Mr. Meany had the herpes virus and that he transmitted it to his wife. It is only necessary that defendant know or suspect that he had symptoms suggesting any kind of venereal disease in order for the duty to be imposed that he either refrain from sexual contact with his wife or warn her of his symptoms. We cannot say that the jury erred in concluding, with all the evidence before them, that Mr. Meany knew, should have known, or should have suspected that he was infected.
In addition, several experts were asked to speculate on the source of Mrs. Meany's sexually transmitted diseases. Mr. Meany complains that their opinions were sought, over his objection, and were based on the assumption that all Mrs. Meany's pre-marital sexual partners had tested negative for herpes, that only he had tested positive for herpes, and that she had no symptoms of herpes prior to the birth of their third child in December 1985. These assumptions, he says, are not supported by the evidence. In that regard, Mr. Meany points out that there was evidence presented to the jury on the absence of infection in only one of Mrs. Meany's sexual partners and that the evidence concerning Mrs. Meany's onset of symptoms is disputed.
It is a recognized principle of the law of evidence that if expert testimony given in response to hypothetical questions is predicated on a statement of unproven facts, it has no probative value and should not affect the outcome of the case. Brown v. Aetna Casualty & Surety Co., 96 So.2d 357, 360 (La.App.2d Cir.1957). Although it is the judge's province to rule improper a hypothetical question predicated on facts totally lacking support in the record, an error in this regard is not reversible as long as other evidence fairly proves the matter addressed by the improper hypothetical. Guerra v. W.J. Young Construction Co., Inc., 165 So.2d 882, 887 (La.App. 4th Cir.1964). The jury, whose responsibility it is to determine the facts from the evidence, should decide whether or not the evidence proves the facts upon which the hypothetical was predicated. Ultimately, the weight to be given expert testimony is dependent upon the facts on which it is based as well as the professional qualifications and experience of the expert. If the opinion is based upon facts not supported by the record, the opinion may be rejected. Thomas v. Petrolane Gas Service Ltd. Partnership, 588 So.2d 711, 719 (La.App.2d Cir. 1991). In this case, we need not determine what weight has been or should have been accorded the expert testimony for there is independently in this record evidence upon which the jury could have concluded that Mr. Meany was the source of his former wife's sexually transmitted disease.
Based on all the evidence in the record, we find that the jury's conclusion, that Mr. Meaning was negligent and that his negligence was the cause of his former wife's injury, was a reasonable one. Thus, "[e]ven though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony." Stobart v. State through DOTD, 617 So.2d 880, 882 (La.1993) (citing Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, *237 365 So.2d 1330 (La.1978)). The appellate court erred in rejecting the findings of the jury, which were not clearly wrong.
While we have found evidentiary support for the jury's determination of Mr. Meany's negligence with regard to the transmission of herpes to his wife, there is nothing to show that he gave her venereal warts. Therefore, that part of the damage award allocated by the jury to compensate Mrs. Meany for medical expenses and damage associated with the treatment of this disease must be eliminated from the total award of $125,000.00. In support of her claims for infection with dual, sexually transmitted diseases, Mrs. Meany offered into evidence medical expenses of $21,324 for laser surgery to remove the venereal warts as well as testimony concerning past physical pain associated with the procedure and concerning the possibility of future complications. We will reduce the jury's award of $50,000 for medical expenses by the cost of the laser surgery, that is, by $21,324, and the awards for past and future pain and suffering ($7,500) and for past and future mental anguish ($50,000) by $10,000. Thus, Mrs. Meany's award for medical expenses is reduced from $50,000 to $28,676, and the combined awards for past and future pain and suffering and mental anguish is reduced from $57,500 to $47,500, resulting in a gross award of $93,676.00.

DECREE
For the foregoing reasons, the judgment of the court of appeal is reversed, and the judgment of the trial court concerning liability and quantum is reinstated with the exception that the award for damages is reduced from $125,000.00 to $93,676.00.
REVERSED AND RENDERED.
SHORTESS, J. Pro Tem., dissents.
HALL, J., dissents for the reasons expressed in the court of appeal opinion.
NOTES
[*] Ortique, J., not on panel. Rule IV, Part 2, § 3.

Judge Melvin A. Shortess, Court of Appeal, First Circuit, sitting in place of Justice James L. Dennis.
[1] In describing these actions in his deposition, the relevant transcript of which was read at trial, Mr. Meany stated that "As best as I can remember, I mean, I kept condoms. As far as I can recall, I used them when the opportunity came up."
[2] According to the testimony of Dr. Simon V. Ward, it is not certain just how contagious herpes is when there is not an outbreak. However, the risk of infection is not absent, because asymptomatic viral shedding may occur. Karp & Karp, Domestic Torts: Family Violence, Conflict and Sexual Abuse 77 (1989).
[3] Herpes simplex virus type 1 usually attacks above the waist and type 2 usually appears below the waist. While both viruses have been found in fever blisters and in genital ulcers, usually, infections with the herpes virus in one location cannot be transmitted to another place on the body, according to testimony of the medical expert. In addition, expert testimony pointed out that, upon infection, some bodies were able to fight the virus and not develop symptoms. However, the antibodies developed would result in a positive blood test.
[4] In fact, La.Rev.Stat.Ann. § 14:43.5 (West Supp. 1994) makes it a felony, permitting a fine of not more than $5,000 and/or imprisonment with or without hard labor for not more than ten years, for a person intentionally to expose another to any acquired immunodeficiency syndrome virus through sexual contact or any means or contact without the knowing and lawful consent of the victim.