SANDRA CABRINA JENKINS, Judge.
hThe plaintiff, Kathleen G. Frost, initiated this action in order to recover damages for injuries she sustained in an automobile accident which occurred on September 8, 2009. Named as defendants were Chris Carter, the uninsured driver who rear-ended Frost’s vehicle, and Automobile Club Inter-Insurance Exchange (“ACHE”), Frost’s uninsured/underinsured insurance carrier. It was undisputed at trial that the plaintiff suffered from neck and back injuries, and from bilateral carpel tunnel syndrome prior to the accident. Following a bench trial, the trial court rendered judgment in favor of the plaintiff and awarded $13,000.00 in damages, plus interest and costs, for an exacerbation of the plaintiffs pre-existing neck, back, and left carpel tunnel symptoms. ACI-IE has filed this appeal arguing that the trial court manifestly erred in awarding damages to the plaintiff because the plaintiff failed to satisfy her burden of proving that her injuries were caused or aggravated by the automobile accident at issue in this case. For the reasons discussed below, we affirm the trial court’s judgment.
1 .BACKGROUND
Kathleen Frost alleges she injured her neck, back and wrist when a Jeep Cherokee driven by Chris Carter rear-ended her Volkswagen Beetle while stopped at a traffic light.[1] As a result of the impact, Frost’s car was pushed into the pick-up truck stopped ahead of her.
During trial, Frost admitted that she suffered from pre-existing injuries to both her neck and back, and that she had been diagnosed with carpel tunnel syndrome prior to the 2009 automobile accident. She did not dispute that her problems began in 2001, when she fell out of a tree. Following the fall, she began treating with Dr. William J. Johnston, who diagnosed her with spondylotic stenosis and displaced in-tervertebral discs at C5-6 and C6-7. She also complained of problems with her *62 hands, and was diagnosed with carpel tunnel syndrome in 2002. Frost was subsequently involved in two other automobile accidents in 2002 and 2005; after each, she presented to the emergency room with complaints of neck pain. Lastly, Frost claimed to have been injured in a slip and fall accident at a restaurant in July of 2008, for which she also filed a lawsuit.[2] Although Frost remained under the care of Dr. Johnston until after the 2009 accident, Dr. Johnston died prior to trial and before his deposition could be taken. Frost did not call any other treating physicians or medical experts to testify on her behalf at trial.
laFrost testified that she went to the hospital the day after the accident, September 9, 2009, because she began aching in her “neck, back, and everything on down.” While there was no indication that she specifically complained of wrist pain at the hospital, at trial, Frost testified that the accident caused the pain from her previously diagnosed left carpel tunnel syndrome condition to worsen.
Frost’s boyfriend, Phillip Canella, also testified on her behalf at trial. Canella testified that he went to the scene of the accident, checked out Frost’s car to see if she could drive it home, and then followed her home. Canella stated that no one appeared to be seriously injured when he arrived at the scene, and that Frost told him that “she was hit hard and shaken but thought she would be okay.” According to Canella, in “the days following the accident,” Frost began to complain of “[plain and discomfort in her hands, arms, lower back, [and] legs.” Canella stated that “visibly, [she] wasn’t herself and was in discomfort.”
Frost’s testimony was further corroborated by emergency department records from East Jefferson General Hospital, which indicated that Frost presented to the emergency department on September 9, 2009, with complaints of head and neck pain; increasing soreness in her lower back; some radicular symptoms going down her butt into her right leg; and some stiffness and soreness in her neck and her interscapular area. She also reported symptoms of chronic arthralgias, myalgia and low back pain. She complained of occasional radicular symptoms that were worse on that day. She denied any loss of consciousness, dizziness or blurry vision. Frost reported a medical history of anxiety and a past surgical history that | ¿included a hysterectomy, appendectomy, oophorec-tomy, cervical fusion, lumbar laminectomy, breast reduction, and tonsillectomy. The emergency physician, Dr. Raul Guervara, reported that he discussed further management of Frost’s condition with Dr. Johnston who recommended treatment with Medrol Dosepak, Lodrine, and Neu-rontin, and further recommended that the plaintiff follow-up with his office in a week or two.
Included in the medical records introduced at trial was also a report dated October 12, 2009, from neurologist, Dr. R. Hugh Fleming, to Dr. Johnston. In the summary of the report, Dr. Fleming stated, “this patient was injured in an automobile accident several weeks ago when she was hit from behind. She has been having increasing pain and numbness in her back with radiation to both legs. She is also having increasing numbness in her hands.” He noted a past history of possible carpel tunnel syndrome, and neck and back surgery. EMG findings showed mild chronic changes in the legs bilaterally with no new or active denervation noted. A nerve conduction study showed evidence of moderately severe slowing of the median nerves *63 through carpel ligaments bilaterally, and slightly greater on the left. Dr. Fleming’s impression was that the electrodiagnostic studies conducted showed evidence of moderately severe bilateral carpel tunnel syndrome, left greater than right, which may have been exacerbated by the accident. He was of the opinion that testing of the lower extremities showed evidence of chronic changes from previous disc pathology and surgery and scarring, but no evidence of new or recurrent root compression.
IfiMedical records further indicated that Frost had been treated by Dr. Michael Wilensky, periodically since 2002. Dr. Johnston last referred her to Dr. Wilensky for nerve conduction studies related to her carpel tunnel syndrome on July 28, 2009, a mere six weeks before the accident with Carter. Dr. Wilensky’s impression at that time was mild chronic neurogenic atrophy consistent with radiculopathy and moderate to severe left carpel tunnel syndrome.
Frost ultimately underwent left carpal tunnel release surgery in April of 2010, approximately seven months after the accident. According to the plaintiff, although she had been scheduled for the surgery prior to the accident, she had discussed it with her surgeon, Dr. Johnston, and they decided that she would hold off on that surgery until she could no longer tolerate the pain.
ACIIE’s medical expert, Dr. Kim Le-Blanc,[3] testified and was of the opinion that the September 2009 accident had nothing to do with Frost’s left wrist carpel tunnel syndrome. Dr. LeBlanc explained that this opinion was based on his observation that Frost’s carpel tunnel predated the accident by at least seven years. In addition, he opined that Frost’s carpel tunnel syndrome was instead caused by normal anatomical variation referred to as marked hypertrophy, or enlargement, of the palmer aperneurosis, which Frost was born with. On cross-examination, Dr. Le-Blanc admitted Frost’s medical condition could have been aggravated under certain circumstances; however, he denied that it could have been aggravated under the circumstances in this case because he believed that Frost’s symptoms | fiwould have manifested no later than 7 to 14 days following the accident if they had been caused by a soft tissue injury to her wrist. He noted that the plaintiff testified that her wrist pain instead began two months later.
The report of defense expert, Dr. John England, was also admitted into evidence at trial. Dr. England similarly opined that there was nothing in the medical evidence or deposition testimony to indicate that Frost’s carpel tunnel syndrome symptoms became worse due to the accident. His opinion was based in part on his observation that the plaintiff testified during her prior deposition that she decided to have surgery on her left wrist due to problems with numbness and gripping things, and that the problems began approximately two months after the accident.
Counsel for ACHE additionally cross-examined Frost based on deposition testimony from her slip and fall claim against the restaurant, in an attempt to show that all of her injuries predated the 2009 motor vehicle accident.
JUDGMENT
In finding for the plaintiff, the trial court reviewed the evidence, including reports from Dr. Quería, Dr. Fleming, Dr. Le- *64 Blanc, and Dr. England. After remarking that Dr. Fleming’s report was prepared on “October 12, 2009, only ... a month and 4 days” after the wreck, the trial court ruled in favor of the plaintiff, in effect, rejecting the defense experts’ opinions that there was insufficient evidence of proximal connection to link the plaintiffs complaints of increased wrist pain to the accident. The trial court also rejected the defendant’s position that Frost’s neck 17and back injuries were not aggravated by the accident. Based on its findings, the trial court rendered judgment in favor of the plaintiff, awarding general damages of $13,000.00, plus interest and court costs.[4]
DISCUSSION
A. Evidence regarding exacerbation of Ms. Frost’s neck, back and wrist injuries
In its first assignment of error, the Defendant, ACHE, complains that the trial court erred in awarding damages for an exacerbation of Frost’s pre-existing neck and back injuries, because “Frost specifically testified at trial that the accident in question did not have any effect on her neck or back.” In its next two assignments of error, ACIIE complains that the trial court erred in awarding damages to Frost for an exacerbation of her left wrist carpal tunnel syndrome absent expert medical testimony to support it, and when such an award was contrary to, and unsupported by, the evidence admitted at trial. These three assignments of error are reviewed collectively below for ease of discussion.
In a personal injury action, the plaintiff bears the burden of proving — by preponderance of the evidence — that the injuries sustained were caused by the accident at issue. Maranto v. Goodyear Tire & Rubber Co., 94-2603, p. 3 (La.2/22/95), 650 So.2d 757, 759; American Motorist Ins. Co. v. American Rent-All, Inc., 579 So.2d 429 (La.1991). “The test for determining the causal relationship between an accident and a subsequent injury is whether the plaintiff proved through medical or lay testimony that it is more probable than not that the ^subsequent injuries were caused by the accident.” Chavers v. Travis, 04-0992, p. 7, (La.App. 4 Cir. 4/20/05), 902 So.2d 389, 394 (citing Maranto, 94-2603, p. 3, 650 So.2d at 759). Proof to a reasonable medical certainty is not required. Lasha v. Olin Corp., 625 So.2d 1002, 1005 (La.1993).
Whether an accident is the cause of the plaintiffs injuries is a question of fact which should not be disturbed absent manifest error, or unless the trial court was clearly wrong. Stobart v. State through DOTD, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). In other words, as the reviewing court, our duty is not to determine whether the trial court’s findings are right or wrong in an absolute sense, nor is it to determine whether we might have reasonably reached a different conclusion when presented with the same evidence; rather, our sole task is to ask whether the factfinder’s resolution of the conflicting evidence was reasonable in light of the record as a whole. Freeman v. Poulana/Weed Eater, 93-1530 (La.1/14/94), 630 So.2d 733; Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Where there is a conflict in testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Chavers, 04-0992, p. 8, 902 So.2d *65 at 394 (citing Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973)).
In addition, that an accident victim suffered from a pre-existing condition does not bar a victim from being compensated for an aggravation or worsening of that condition as a result of the new accident. Because a defendant “takes his victim as he finds him,” the defendant “is responsible for all natural and probable | gconsequences of his tortious conduct.” Laska, 625 So.2d at 1005. Consequently, if the defendant’s conduct is responsible for aggravating a pre-existing condition, he must compensate the victim for the full extent of the aggravation, “even if some or all of the injuries might not have occurred but for the plaintiffs preexisting physical condition, disease, or susceptibility to injury.” Chavers v. Travis, 04-0992, p. 7, (La.App. 4 Cir. 4/20/05), 902 So.2d at 394 (quoting 2 Stein on Personal Injury Damages 3d § 11.1). Nevertheless, the plaintiff must still prove causation; therefore, “[i]f the evidence establishes that a plaintiffs pre-accident and post-accident conditions are identical in all meaningful respects, the plaintiff has failed to carry his burden of proving causation.” Chavers, 04-0992, p. 9, 902 So.2d 389, 394-95 (citing Juneau v. Strawmyer, 94-0903, p. 8 (La. App. 4 Cir. 12/15/94), 647 So.2d 1294, 1300).
With regard to the plaintiffs neck and back injuries, our review of the record reveals that Frost did, in fact, testify that her neck and back were injured following the wreck, although her testimony was arguably inconsistent. While Frost specifically testified that she did not “feel any injury” immediately following the wreck, she stated that she started “aching the following day,” and went to the emergency room with complaints of pain to her neck and back. Later, when asked what injuries she sustained from the wreck, Frost responded, “I feel like it was my left carpel tunnel.” She further responded that swimming was therapeutic for her | minjuries, stating, “I have chronic pain in my neck and my back and if I don’t visit the water every day, I am an unhappy camper.”[5]
During cross-examination, however, Frost was asked, “Now, in the September 8, 2009 accident you didn’t injure your neck or back, did you?” Frost responded, “Correct.” When asked if her back injury instead resulted from her prior fall at the restaurant, Frost again responded, “Correct.” The following dialogue continued:
Q: And those injuries, and those problems you were having [from the fall] continued after this accident?
A: Correct.
Q: This accident didn’t make them worse?
A: Correct.
Q: Didn’t aggravate your pre-existing condition?
A: Correct.
Q: So the only injury you believe that is related to the September 2009 motor vehicle accident is the. left sided carpel tunnel accident?
A: I believe it was aggravated, yes.
As regards her left wrist injury, Frost testified that she was unable to recall exactly when she began having problems with left carpel tunnel syndrome. She admitted that she was scheduled to have surgery before for accident, but claims that she told Dr. Johnston she wanted to postpone it “if [she was] not really hurting that bad” because she was “scared to death to undergo anesthesia.” Frost further claimed that Dr. Johnston told her *66 that surgery could be postponed until she could not “handle it anymore.” She testified, “[A]nd that’s when I got in the wreck and it really started bothering me after the wreck and it got worse, so that’s when I decided to check it out and I think I finally ended up doing surgery in April.”
|nIn reaching a finding in favor of the plaintiff, the trial court stated:[6]
The Court notes that there is no question that the accident happened, no question that the plaintiff went to the emergency room at East Jeff following the accident, no question that she made significant complaints, though her complaints were relative to her back and her neck, she related those to the accident. The plaintiff ... and I know that the defense counsel spent much time trying to discredit the plaintiff but the reality is if this young lady wanted to she could clearly, clearly have suggested that there was significant aggravation of a pre-existing problem with her neck and back. There is no indication that she attempted to do so. The Court notes the plaintiffs demeanor, her appearance, her attempt to answer the questions as posed by defense counsel. The Court does note that plaintiff was at a significant disadvantage to the extent that Doctor Johns[t]on is no longer living and therefore the Court notes that the plaintiff has the burden of ... proving by a preponderance of the evidence that ... any and all injuries sustained as a result of this incident were in fact caused by this accident.
Of significance the Court notes plaintiff appears to be a horrible historian.... The problem in this is you take your victim as you find them. We know that, that’s the law and there is no question that Miss Frost had a pre-existing back and neck problem. She was on ongoing treatment with her orthopedist. (Emphasis added).
The trial court’s oral reasons for judgment also recognized that the plaintiff “had existing carpel tunnel syndrome for which she had been recommended surgery and which she was attempting to undergo surgery,” and concluded:
[Bjecause she was in the process of undergoing the surgery, I believe based on what I reviewed that there was some exacerbation of her complaints relative to her wrist, relative to her back, relative to her neck, however, I cannot say and will not say that that exacerbation necessitated the surgery. The surgery was already preplanned. What she’s entitled to is the exacerbation that was caused by this incident. (Emphasis added).
| ^.The record shows that the trial court reviewed the medical evidence and heard live testimony from Frost, her boyfriend, and the defense expert, Dr. Kim Edward LeBlanc; thereafter, it made credibility determinations based on its observations. Where findings are based largely on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands that great deference be given to the trier of fact’s findings, for only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s under *67 standing and belief in what was said. Scott v. State Farm Fire & Cas. Co., 47,-490 (La. App 2 Cir. 9/26/12), 106 So.3d 607; Ratcliff v. Normand, 01-1658 (La.App. 3 Cir. 6/5/02), 819 So.2d 434.
Applying the manifest error standard of review, we cannot say that the trial court erred in finding for the plaintiff. Although there were some inconsistencies in the plaintiffs testimony regarding whether she attributed any neck and back pain to the 2009 automobile accident, based on our review of the transcript, it was not unreasonable for a trier of fact to conclude that the plaintiff may have been confused or easily led by defense counsel; for instance, plaintiff repeatedly responded “correct” during cross examination, even when inconsistent with prior testimony on direct. For this reason, this Court is required to give deference to the trial court which was in the best position to view the plaintiffs demeanor and facial expressions, and to determine whether or not she, for instance, appeared truthful or confused. “The trial court’s credibility determinations must be given | 1sgreat deference because only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief of what is said.” Billiot v. Billiot, 01-1298, pp. 5-6, (La.1/25/02), 805 So.2d 1170, 1174 (citing Rosell v. ESCO, 549 So.2d 840, 844 (La.1989)).
We also cannot agree with the defendant that this is the type of situation where the plaintiff was required to rely on expert testimony to carry her burden of proof. As explained by the Louisiana Supreme Court, “While expert medical evidence is sometimes essential, it is self-evident that, as a general rule, whether the defendant’s fault was a cause in fact of a plaintiffs personal injury or damage may be proved by other direct or circumstantial evidence.” Lasha, 625 So.2d at 1005 (La.1993). In other words, while expert evidence is sometimes needed to prove causation “[wjhere the conclusion is not one within common knowledge ... on medical matters within common knowledge, no expert testimony is required to permit a conclusion as to causation.” Id. (internal citations omitted); see also, Chavers, 04-0992, p. 10, 902 So.2d at 395.
Here, the trial court specifically stated that its ruling was not based on a finding that the plaintiffs carpel tunnel syndrome surgery was necessitated by the September 2009 automobile collision. Had the court so ruled, expert evidence to support the plaintiffs claims would have been expected.[7] To the contrary, the court only found that the plaintiffs generalized complaints of increased pain and |usoreness were attributed to the accident. Because the causal link between trauma and increased pain and soreness is often within the realm of determinations not always requiring expert evidence, we cannot say the trial court manifestly erred.[8]
B. Report by Dr. R. Hugh Fleming
In its fourth assignment of error, ACIIE complains that the trial court erred *68 in basing its finding of medical causation, in whole or in part, on a report prepared by Dr. R. Hugh Fleming, whom Frost did not call to testify .at trial, who was not tendered or accepted as an expert witness, and whom ACIIE did not have an opportunity to cross examine. We find that this argument has no merit.
ACIIE jointly introduced the records from Dr. Fleming as part of the medical evidence prior to trial, and jointly stipulated to its authenticity. In addition, although the parties expressly reserved their right to object to the jointly introduced exhibits during trial, ACIIE failed to do so, and instead attempted to examine its own expert, Dr. LeBlane, regarding the information contained in Dr. Fleming’s October 12, 2009 report.[9] Moreover, Dr. Le-Blanc testified that he relied on information contained in Frost’s medical records, including the EMG studies from Dr. Fleming dated October 12, 2009, and March 20, 2010. Lastly, defendant’s non-testifying expert, Dr. England, also referenced Dr. Fleming’s records in his report.
11fiBased on the foregoing, it is clear that the defendant knew well in advance that the plaintiff was relying on information contained in Dr. Fleming’s report. As a result, ACIIE could have deposed Dr. Fleming in advance of trial but chose not to do so. A defendant cannot waive its right to examine a treating physician whose records it introduces and relies on at trial, and then claim that the evidence was admitted in violation of its right.[10] It is well-settled that when a party fails to contemporaneously object to the introduction of objectionable evidence, that party waives the right to complain of the issue on appeal. Trans-Global Alloy Ltd. v. First Nat. Bank of Jefferson Parish, 588 So.2d 443, 448-49 (La.1991). It is also a “ ‘well-established commonsense principle’ that [generally, a party introducing evidence cannot complain on appeal that the evidence was erroneously admitted.’ ” Ohler v. U.S., 529 U.S. 753, 755, 120 S.Ct. 1851, 1853, 146 L.Ed.2d 826 (2000). Under these circumstances, we cannot say that the trial court erred in considering the contents of Dr. Fleming’s report.
C. Testimony of Dr. Kim LeBlane
In its fifth assignment of error, ACIIE argues that the trial court erred in misstating Dr. Kim LeBlanc’s testimony in order to justify an award of damages to Frost for an exacerbation of her pre-exist-ing left wrist carpal tunnel syndrome. 11fiMore specifically, ACIIE argues that the trial court misinterpreted Dr. LeBlanc’s testimony regarding the time frame within which plaintiffs alleged aggravation of her carpel tunnel injury should have manifested in order to be attributed to the wreck. We disagree.
Dr. LeBlane was of the opinion that if the plaintiff “was going to have any symp *69 toms related to the accident that would exacerbate her carpal tunnel syndrome that should have occurred within 2 weeks of the accident.” He stated:
It’s in all, virtually all injuries, soft tissue injuries that are sustained for any reason, you have normal swelling that occurs, you have inflammation that occurs, that usually occurs within 24 to 48 hours, that’s the onset. Depending on the severity though it will be resolved within 7, 10, perhaps 14 days. So if she [Frost] was going to have any symptoms related to the accident that would exacerbate her carpel tunnel syndrome that should have occurred within 2 weeks of the accident
At trial, counsel for ACIIE asked Dr. LeBlanc whether he recalled Frost’s testimony as to the time-frame within which she said she experienced left carpel tunnel syndrome after the September 8, 2009 accident. He responded that he did, and he said it was approximately two months later. Moreover, both Dr. LeBlanc’s and Dr. England’s reports reference plaintiffs prior deposition testimony that her symptoms worsened approximately two months after the accident.
In its oral reasons for judgment, the trial court casually referred to this two month period as a “litmus test,”[11] while noting that there was evidence that the plaintiff was treated for carpel tunnel syndrome much sooner than two months |17after the wreck. The fact that the court highlighted this discrepancy suggests that the court relied on the experts’ repeated references to the plaintiffs two-month estimate for when her wrist problems began to worsen — despite medical evidence to the contrary — to discredit the expert’s positions. In doing so the trial court essentially rejected the experts’ opinions regarding the time by which Frost’s pain should have manifested. The weight to be given expert testimony depends not only on the professional qualifications and experience of the expert, but also on the facts on which it is based. Meany v. Meany, 940251, (La.7/5/94), 639 So.2d 229, 236. For an expert opinion to be valid and merit much weight, the facts upon which it is based must be substantiated by the record; if the facts are not substantiated by the record, the trial court may reject the opinion. Miller v. Miller, 01-0356, p. 8 (La.App. 3 Cir. 10/31/01), 799 So.2d 753, 758; Gould v. Gould, 28,996, (La.App. 2 Cir. 1/24/97), 687 So.2d 685, 690; Rogers v. Roch, 95-242, p. 16 (La.App. 5 Cir. 10/18/95), 663 So.2d 811, 817-18; Meany, 94-0251, p. 11, 639 So.2d at 236. As a result, we cannot say the trial court’s finding was clearly wrong or unreasonable; therefore there is no merit to this assignment of error.
D. Motion for Involuntary Dismissal
In its sixth assignment of error, ACIIE argues that the trial court erred in denying ACIIE’s motion for an involuntary dismissal at the close of Frost’s case in chief because the Plaintiff did not prove medical causation by a preponderance of the evidence by the close of her case in chief.
11sLouisiana Code of Civil Procedure Article 1672(B) governing the motion for involuntary dismissal in a bench trial, states:
In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not *70 granted, may move for a dismissal of the action as to him on the ground that upon the facts and the law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the 'plaintiff and in favor of the moving party or may decline to render judgment until the close of all the evidence. (Emphasis added).
The trial court acted within its discretion when it denied ACIIE’s motion to dismiss and heard all of the evidence before rendering its decision. The plain language of Article 1672 affords the trial judge the discretion to render judgment or to decline to render any judgment until the close of all the evidence, and the decision of a trial court to deny a motion for involuntary dismissal at the close of the plaintiffs case leaves nothing to review on appeal. See e.g., Townsend v. Delchamps, Inc., 94-1511 (LaApp. 1 Cir. 10/6/95), 671 So.2d 513; Driggers v. Kroger Co., Inc., 29,431 (LaApp. 2 Cir.4/4/97), 692 So.2d 1338; Riser v. American Med. Int’l, Inc., 620 So.2d 372 (LaApp. 5th Cir.1993); Parker v. Winn-Dixie La., Inc., 615 So.2d 378 (LaApp. 5th Cir.1993). Therefore this assignment of error has no merit.
E. Damages
In its seventh and final assignment of error, ACIIE maintains that the trial court abused its discretion when it awarded Frost $13,000.00 for an exacerbation of her neck, back, and left wrist carpal tunnel syndrome symptoms because the |19award was excessive based on the record, which did not contain any evidence on the nature, extent, or duration of any such exacerbations.
General damages are those damages that are inherently speculative in nature and cannot be fixed with mathematical certainty, including pain and suffering. Parker v. Robinson, 05-0160, p. 1 n. 2 (La.App. 4 Cir. 2/22/06), 925 So.2d 646, 648. When damages are not susceptible to precise measurement, great discretion shall be left to the trial court for the reasonable assessment of these damages. La. C.C. art. 1999. This great discretion should rarely be disturbed on appeal. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993). Rather, reversal of a general damages award is only warranted where the trier of fact abused its great discretion, as evidenced by a finding that the award is so high or so low in proportion to the injury that it shocks the conscience. Lino v. Allstate Ins. Co., 06-0166, p. 8 (LaApp. 4 Cir. 8/2/06), 937 So.2d 888, 894. In addition, “[t]he defendant’s liability for damages is not mitigated by the fact that the plaintiffs preexisting physical infirmity was responsible in part for the consequences of the plaintiffs injury by the defendant.” Lasha, 625 So.2d at 1005 (internal citation omitted). Under the circumstances of this particular case, we do not find that the damage award constituted an abuse of the trial court’s discretion; therefore this assignment of error lacks merit.
| ^CONCLUSION
For the reasons discussed above, the trial court’s judgment in favor of Kathleen G. Frost and against the defendant, Automobile Club Inter-Insurance Exchange, is affirmed.
AFFIRMED.

. ACHE was determined to be liable based on the trial court's finding that Chris Carter was solely at fault.

. Frost’s deposition transcript from this lawsuit was admitted into evidence.

. The trial court accepted Dr. LeBlanc as an expert in the field of medicine with a specialty in family practice and sports medicine.

. The plaintiff stipulated that she was not asserting a claim for property damage, loss of use, or loss of income prior to trial.

. Frost, a school teacher, had a second job as a swim instructor.

. It is well-settled law that the trial court’s oral or written reasons form no part of the judgment. State v. Williams, 11-0958, p. 9 (La.7/2/12), 94 So.3d 770, 776; Burmaster v. Plaquemines Parish Government, 07-1311, pp. 1-2 (La.8/31/07), 963 So.2d 378, 379 (per curiam). Nevertheless, it is not improper for an appellate court to consider the reasons for judgment in determining whether the trial court committed a legal error. Winfield v. Dih, 01-1357, p. 9 (La.App. 4 Cir. 4/24/02), 816 So.2d 942, 948; Donaldson v. Universal Eng’g of Maplewood, Inc., 606 So.2d 980, 988 (La.App. 3d Cir.1992).

. In Chavers, 04-0992, p. 9, 902 So.2d at 395, we recognized that differentiating between damages caused by an accident and damages caused by the normal progression of a preexisting condition often presents complex legal and medical issues that can be analyzed by applying a five-part test that examines and compares the plaintiff's pre and post-accident symptoms.

. There is nothing to indicate that the trial court applied the presumption of liability set forth in Housley v. Cerise, 579 So.2d 973, 980 (La.1991). Under Housley, a plaintiff's injuries are presumed to have resulted from an accident if the plaintiff was in good health prior to the accident but, commencing with the accident, the symptoms of the disabling condition manifest themselves.

. An objection by plaintiffs counsel was sustained on the grounds that Dr. Fleming’s report was a written document that speaks for itself.

. Although it is well-established that La. R.S. 13:3714 eliminates the requirement that the proponent of medicad records lay a foundation for their admission, beyond certification, here, the parties instead stipulated to the authenticity of the medical records. Cf. State v. Juniors, 03-2425, p. 43, (La.6/29/05), 915 So.2d 291, 324; Judd. v. State, Department of Transportation and Development, 95-1052, p. 3 (La. 11/27/95), 663 So.2d 690, 693-695. The purpose of this hospital records exception to the hearsay rule is to save parties the difficulty and expense of producing each person who assisted in the patient’s treatment as a witness. In addition, the statute shifts the burden to the opposing party to undermine the medical record’s evidentiary weight and veracity by cross-examining those who made the record. Judd, 95-1052, p. 3, 663 So.2d at 693.

. Although ACIIE argues that the trial court mistakenly understood Dr. LeBlanc's testimony to be that the plaintiffs symptoms should have manifested no more than two months after the accident, rather than two weeks, that does not appear to be the case.