STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

14-433 consolidated with 13-1409

ED GRABOWSKI, ET UX.

VERSUS

SMITH & NEPHEW, INC., ET AL.

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2008-3878
HONORABLE DAVID A. RITCHIE, DISTRICT JUDGE

**********

ELIZABETH A. PICKETT
JUDGE

**********

Court composed of Elizabeth A. Pickett, James T. Genovese, and Phyllis M. Keaty, Judges.

WRIT DENIED. JUDGMENT AFFIRMED IN PART; REVERSED IN PART; AND REMANDED FOR FURTHER PROCEEDINGS.

Charles Schrumpf
Schrumpf & Schrumpf
3801 Maplewood Dr.
Sulphur, LA 70663
(337) 625-9077
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    Ed Grabowski
    Patsy Grabowski

**Steven Broussard**
**Broussard & Hart, LLC**
**1301 Common Street**
**Lake Charles, LA 70601**
**(337) 439-2450**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
  **Ed Grabowski**
  **Patsy Grabowski**

**Kim E. Moore**
**Leila A. D'Aquin**
**Irwin Fritchie Uquhart & Moore**
**400 Poydras St., Suite 2700**
**New Orleans, LA 70130**
**(504) 310-2100**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
  **Smith & Nephew, Inc.**
  **PUREPLAY Orthopaedic Sales 1, Ltd.**
  **Daniel Forrest**

**Benjamin J. Guilbeau, Jr.**
**Stockwell, Sievert, Viccellio, Clements & Shaddock, L.L.P.**
**P. O. Box 2900**
**Lake Charles, LA 70602-2900**
**(337) 436-9491**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
  **Smith & Nephew, Inc.**
  **PUREPLAY Orthopaedic Sales 1, Ltd.**
  **Daniel Forrest**

**PICKETT, Judge.**

This is a suit for damages resulting from a total knee replacement in which one component of a two-part interlocking knee implant device was not the proper size. The plaintiffs filed a writ application after no action was taken in the trial court on a Motion to Substitute Counsel and Motion for Recusal they filed. They filed this appeal after their claims against the defendants were dismissed on summary judgment. The writ application was consolidated with this appeal. For the reasons that follow, we find no error with the trial court's failure to act on the Motion to Substitute Counsel and Motion for Recusal but reverse the grant of summary judgment in favor of the defendants. The matter is remanded to the trial court for further proceedings.

## FACTS AND PROCEDURAL HISTORY

On July 18, 2007, Patsy Grabowski underwent a total knee replacement by Dr. Geoffrey Collins at West Calcasieu Cameron Hospital (West Cal). Dr. Collins used a Genesis II interlocking knee implant to replace Mrs. Grabowski's right knee. The implant was manufactured by Smith & Nephew, Inc. and distributed by PUREPLAY Orthopaedic Sales 1, Ltd. (PUREPLAY). Daniel Forrest, a sales representative for Smith & Nephew and PUREPLAY, was in the operating room (OR) during the surgery[1] to make available different sizes of the implant because measurements to determine the proper size implant for Mrs. Grabowski had to be made by Dr. Collins during the surgical procedure.

The implant consists of two parts: a tray that fits into the center of the femur and a polyethylene (poly) insert that fits into the tray and into the center of the

---

[1] Pursuant to West Cal policy, medical sales representatives are allowed in the OR during surgery, though not in the sterile field, to provide medical devices and assistance regarding the devices they sell. The sales representatives do not assist in direct care to patients but do provide informational assistance regarding the devices and procedures utilizing those devices.

tibia. After using a trial implant, Dr. Collins determined that Mrs. Grabowski required a size 5 implant and stated that out loud. Dr. Collins was given a size 5 tray then a poly insert. He inserted the tray into Mrs. Grabowski's femur, then inserted the poly insert into the tray and tested it to verify that the dovetail mechanism of the implant held the tray and insert together in place as designed by Smith & Nephew. Dr. Collins then completed the surgery.

Two months earlier, Mrs. Grabowski had undergone a total knee replacement on her left leg and recovered with no probleMrs. Mrs. Grabowski's recovery after the July surgery went well initially, but she later developed probleMrs. Believing that the insert in the right knee might have come out of place, Dr. Collins performed surgery on October 24, 2007, to replace the insert. During that surgery, a sales representative being trained by Mr. Forrest determined, while reviewing Mrs. Grabowski's medical records, that a size 3/4 poly insert[2] had been used in the July 18 surgery. A size 5 tray requires a size 5 or size 6 poly insert. According to Dr. Collins, use of the wrong size poly insert caused damage to Mrs. Grabowski's patella tendon which necessitated additional surgeries and medical procedures to repair the damage. After completing the October 24 surgery, Dr. Collins informed Mrs. Grabowski's husband that the Smith & Nephew representative had given him the wrong size insert during the July 18 surgery which caused the insert to come out of the tray and damage the patella tendon.

Believing that Mr. Forrest was employed by Smith & Nephew, Mr. and Mrs. Grabowski filed suit against Smith & Nephew and Mr. Forrest. They alleged that Mr. Forrest negligently provided Dr. Collins the wrong poly insert for the size 5

_____

[2] Each part of the implant has a sticker identifying that part's size; the sticker is removed from each part before it is implanted in the patient and placed in the record of the surgical proceeding.

tibial tray and that he was in the course and scope of his employment with Smith & Nephew when he did so. Thereafter, the Grabowskis learned that Mr. Forrest had signed a contract identified as Sales Representative Agreement with PUREPLAY and added PUREPLAY as a defendant. They asserted that PUREPLAY was also liable for Mr. Forrest's negligent acts. After some discovery was conducted, the defendants filed a Motion for Summary Judgment, seeking to have the Grabowskis' claims dismissed.

A hearing on the Motion for Summary Judgment was held April 23, 2013. After the hearing, the trial court granted summary judgment in favor of Smith & Nephew because Smith & Nephew showed that on July 18, 2007, Daniel Forrest was not its employee and no contract existed between it and Mr. Forrest. The trial court also granted summary judgment in favor of PUREPLAY and dismissed the Grabowskis' claims against it, finding that Mr. Forrest was an independent contractor; therefore, PUREPLAY was not liable for any negligent acts by him.

The trial court deferred ruling on Mr. Forrest's request for summary judgment and allowed the Grabowskis additional time to depose Dr. Collins because their attorney had been allowed only a few minutes to question Dr. Collins after counsel for the defendants had questioned him a total of seven hours over the course of two days. A judgment dismissing Smith & Nephew and PUREPLAY was not signed at that time because the parties decided that in order to avoid having issues addressed piecemeal on appeal, they would wait until the trial court ruled on Mr. Forrest's Motion for Summary Judgment before having a judgment signed.

In early August 2013, the Grabowskis reset Dr. Collins' deposition for August 30. Then on August 6, they rescheduled the deposition, at Dr. Collins'

3

request, for October 11. On September 20, the Grabowskis notified Mr. Forrest's counsel that Dr. Collins' October 11 deposition was being cancelled because attorney Steven Broussard was enrolling as additional counsel for the Grabowskis and he needed additional time to prepare for the deposition.

On September 24, Mr. Forrest had the trial court sign a Motion and Order for Status Conference setting a status conference in the matter for October 3. Later that same day, Charles Schrumpf, the Grabowskis' original attorney, submitted a Motion and Order to Withdraw and Substitute Counsel to the trial judge, Judge Ritchie, for signature. Judge Ritchie refused to sign the order.[3] On September 26, Mr. Broussard submitted a Motion to Substitute Counsel and Motion for Recusal[4] to Judge Ritchie for his signature. On September 30, Mr. Broussard hand delivered a letter to Judge Ritchie regarding the Motion to Substitute and Motion for Recusal in which Mr. Broussard stated that he believed no further proceedings could be conducted until a ruling had been made on the Motion to Substitute Counsel. Mr. Broussard opined that his enrollment necessitated a Motion for Recusal as the result of Judge Ritchie's *sua sponte* recusal of himself in October 2012 in another matter because he was counsel in a suit that involved Judge Ritchie's assistant.

Mr. Broussard sent another letter to Judge Ritchie on October 1 regarding Judge Ritchie's indication that he would not sign the order recusing himself or the

---

[3] Judge Ritchie stated at a hearing held on November 21 that he notified the runner for the Grabowskis' attorney that he would not sign the order because a status conference had been set in the matter.

[4] The Motion to Substitute Counsel and Motion for Recusal was submitted to Judge Ritchie for his signature before being filed with the Clerk of Court. Therefore, the dates referenced in this discussion are based on the dates of correspondence associated with the motions rather than the dates these motions and/or correspondence were filed with the Clerk of Court.

order setting the Motion for Recusal for hearing in which counsel asked Judge Ritchie to grant or deny the motion. The letter also indicated that Judge Ritchie should not proceed with the October 3 status conference because Mr. Broussard had no standing to attend the conference and original counsel had a conflict and could not attend the conference. The status conference was not held.

The defendants filed a Motion to Close the Record on October 10, that requested the record be closed and summary judgment be granted in favor of Mr. Forrest. The hearing was set for hearing November 21. On November 5, Mr. Broussard directed another letter to Judge Ritchie referencing the hearing on the Motion to Close the Record and asked Judge Ritchie to grant or deny the Motion to Substitute Counsel and Motion for Recusal. Judge Ritchie did not act on the motions.

During the course of the November 21 hearing on the Motion to Close the Record, Judge Ritchie outlined his reasons for not signing the Motion to Substitute Counsel and Motion for Recusal and for not setting a hearing on the motion. He observed that a litigant's right to counsel of his choice is a very substantial right; however, that right is not absolute. Judge Ritchie also opined that to allow substitution of counsel at that time was not in the interest of justice because if the substitution was allowed and Mr. Broussard had a valid ground for recusal, the reassignment of the case to a new judge would give the Grabowskis a "second bite at the apple" when summary judgment had been granted in favor of two of three defendants but no judgment had been signed, and the record had been held open to allow the Grabowskis to depose Dr. Collins. Judge Ritchie further noted this would be prejudicial to Smith & Nephew and PUREPLAY.

Judge Ritchie next considered the requirements of the articles governing recusal and pointed out that judgment had been rendered in favor of Smith & Nephew and PUREPLAY during the April 23 hearing; therefore, the Motion for Recusal was not timely under La.Code Civ.P. art 154. Additionally, he observed that a ground for recusal must be stated and that Mr. Broussard apparently assumed he would recuse himself based on his recusal in a previous case. Judge Ritchie also voiced his concern that when the Motion to Substitute Counsel and Motion for Recusal was brought to him for signature, he had already signed an order setting a status conference.

Of great importance to Judge Ritchie was that Mr. Broussard made no effort to determine the accuracy of the information contained in the motion. Judge Ritchie specifically noted two such statements. First, the motion stated, "For unknown reasons, Judge Ritchie refused to sign the motion." However, Judge Ritchie explained that he had informed the runner from Mr. Schrumpf's office who presented the Motion and Order to Withdraw and Substitute Counsel for his signature that he was not signing the Order because a status conference had already been set in the matter. Second, the motion stated that Judge Ritchie had a standing order of recusal in all matters involving Mr. Broussard or other members in his firm, but no such order existed.

At the conclusion of the hearing, Judge Ritchie granted the Motion to Close the Record then granted summary judgment in favor of the Mr. Forrest. Thereafter, a judgment granting summary judgment in favor of all three defendants and dismissing the Grabowskis' suit against them was signed.

6

*Writ Application*

In their writ application, the Grabowskis urged that the trial court erred in not acting on their Motion to Substitute Counsel and Motion for Recusal before the hearing on the defendants' Motion to Close the Record and in denying the motions without a hearing. We have reviewed the record together with the law and jurisprudence and find no error with the trial court's denial of the Motion to Substitute Counsel and Motion to Recuse.

Pertinent to the Grabowski's Motion for Recusal is La.Code Civ.P. art. 151 which provides, in part, that a trial judge "shall be recused when he . . . [i]s biased, prejudiced, or interested in the cause or its outcome or biased or prejudiced toward or against the parties or the parties' attorneys or any witness to such an extent that he would be unable to conduct fair and impartial proceedings." La.Code Civ.P. art. 151(A)(4).

Article 154 of the Louisiana Code of Civil Procedure sets forth the procedure for having a trial court judge recused; it provides:

> A party desiring to recuse a judge of a district court shall file a written motion therefor assigning the ground for recusation. This motion shall be filed prior to trial or hearing unless the party discovers the facts constituting the ground for recusation thereafter, in which event it shall be filed immediately after these facts are discovered, but prior to judgment. If a valid ground for recusation is set forth in the motion, the judge shall either recuse himself, or refer the motion to another judge or a judge ad hoc, as provided in Articles 155 and 156, for a hearing.

The Grabowskis cite *Disaster Restoration Dry Cleaning, L.L.C. v. Pellerin Laundry Machinery Sales Co., Inc.*, 05-715 (La. 4/17/06), 927 So.2d 1094, arguing that Judge Ritchie should have either granted their Motion for Recusal *ex proprio motu* or referred it to another judge for a hearing. Specifically, they rely on this statement in *Disaster*: "Once confronted with valid grounds of recusal, the judge

7

is obligated to either order recusal or refer the case to another judge for a hearing on the motion to recuse." *Id*. at 1097.

The supreme court discussed at length the issue of recusal in *Disaster*, 927 So.2d 1094. Ultimately, however, the court determined that the issue of recusal was premature until a determination had been made regarding the defendant's motion to enroll co-counsel because the issue of recusal would not arise unless the defendant was allowed to enroll co-counsel. The Grabowskis focus their attention primarily on their Motion for Recusal, rather than their Motion to Substitute Counsel.

In *Disaster*, 927 So.2d at 1101, the supreme court addressed the issue of right to counsel of choice, stating:

> The United States Supreme Court has recognized that there is a presumption in favor of a party's right to choose counsel. *Wheat v. United States*, 486 U.S. 153, 158, 160, 108 S.Ct. 1692,1696, 1697-1698, 100 L.Ed.2d 140 (1988). The Fifth Circuit Court of Appeals found that depriving a party of his choice of counsel is a penalty that must not be imposed without careful consideration. *FDIC v. United States Fire Insurance Company*, 50 F.3d 1304, 1313 (5th Cir.1995). In civil matters as well as criminal matters, the right to counsel includes the right to legal representation of one's choice. *McCuin v. Texas Power*, 714 F.2d 1255, 1257. This right is "one of constitutional dimensions and should be freely exercised without impingement." The right to counsel of choice is not absolute. *Id*. at 1262, 1263. This right can be overridden only if it can be proven that there is a compelling reason to do so. *Id*.

> There must be a balance between allowing a party the right to engage an attorney of that party's choice versus enrolling a particular attorney which would result in recusal of the judge to whom the case was randomly allotted. This right must be balanced in cases in which it is called into question against the right to prosecute the lawsuit without question of taint and undue influence and society's right to maintain the highest ethical standards of professional responsibility, as well as judicial integrity. *Id*. Moreover, this right must not be exercised without thought also to the needs of effective administration of justice. *Id*.

We are mindful of the importance of a litigant's right to counsel of choice; however, as Judge Ritchie noted, the litigation in *Disaster*, 927 So.2d 1094, was at a much earlier stage than this litigation is, and summary judgment had been granted in favor of two of the three defendants in this litigation when the Motion to Substitute Counsel was filed. Moreover, Judge Ritchie granted additional time to the Grabowskis to depose Dr. Collins as a courtesy to their counsel after counsel realized that Judge Ritchie was inclined to grant summary judgment in favor of Mr. Forrest as he had for the other defendants. Additionally, we note that Dr. Collins had been deposed by the defendants almost seven months before they filed their Motion for Summary Judgment and approximately eleven months before the hearing on the Motion for Summary Judgment was held, yet the Grabowskis did not reschedule his deposition in that time. Lastly, the Grabowskis had more than five months after they were granted additional time to depose Dr. Collins when they cancelled his rescheduled deposition and sought to change counsel.

We conclude that the posture of this case when the Motion to Substitute Counsel and Motion for Recusal was filed was compelling reason for Judge Ritchie not to act on it. Allowing Mr. Broussard to be substituted as counsel for the Grabowskis may have resulted in the recusal of Judge Ritchie to whom the case had been randomly allotted. Also, it could have possibly reversed the summary judgment that had been granted in favor of two defendants and resulted in prejudice to all the defendants. Additionally, as Judge Ritchie observed, the Grabowskis did not seek different counsel on their own; Mr. Schrumpf sought the assistance of additional counsel after the Motion for Summary Judgment had been heard which led to the Motion to Substitute Counsel and Motion for Recusal. Lastly, the lapse of five months to bring in Mr. Broussard that led to the Motion to

9

Substitute Counsel was not addressed in the Motion to Substitute Counsel and Motion for Recusal.

For these reasons, we find no error with Judge Ritchie's failure to act on the Grabowskis' Motion to Substitute Counsel and Motion for Recusal, and we deny the writ.

### *Summary Judgment*

Mr. Forrest signed a contract with Smith & Nephew in 2004, as a sales representative. In June 2007, Smith & Nephew required him to sign a contract with PUREPLAY. After that time, Mr. Forrest no longer had a contract with Smith & Nephew. The trial court granted summary judgment in favor of Smith & Nephew because it had no contract with Mr. Forrest when Mrs. Grabowski's right knee replacement surgery was performed. It granted summary judgment in favor of PUREPLAY because it determined that pursuant to its contract with Mr. Forrest, Mr. Forrest was an independent contractor, and PUREPLAY was not liable for any negligent acts committed by him. The trial court concluded that Dr. Collins and the nurses in the OR had the ultimate responsibility to insure that the correct implant components were used in Mrs. Grabowski's surgery and that Mr. Forrest had no duty to do so. Therefore, it granted summary judgment dismissing the claims against him.

In their appeal, the Grabowski's present the following issues for review:

1) Does the manufacturer's representative in the operating room owe a duty not to harm the patient?

2) Do the contracts between the manufacturer and distributor and distributor and representative create a stipulation pour autri or [third] party beneficiary contract with the patient being the beneficiary?

3) Do the manufacturer and distributor owe an independent duty to train and supervise their representative so he does not harm the patient?

Appellate courts apply the de novo standard of review, which requires that "the same criteria that govern the trial court's consideration of whether summary judgment is appropriate" be used, when reviewing a trial court judgment on a motion for summary judgment. *Supreme Servs. & Specialty Co., Inc. v. Sonny Greer, Inc.*, 06-1827, p. 4 (La. 5/22/07), 958 So.2d 634, 638. The motion for summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any . . . show that there is no genuine issue of material fact, and that mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(B)(2).

When a motion for summary judgment is supported by an affidavit, "an adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial." La. Code Civ.P. art. 967(B). If the adverse party fails to show a genuine issue of material fact exists, "summary judgment, if appropriate, shall be rendered against him." *Id.*

### Did Mr. Forrest Owe a Duty to the Grabowskis?

The Grabowskis assert that the trial court erred in granting summary judgment in favor of Mr. Forrest because he owed them a duty to insure the proper implant was used in Mrs. Grabowski's surgery. They argue that the improper use of incompatible different sizes of the two parts of the Smith & Nephew knee replacement implant and the resulting damages to them were caused, at the least in part, from Mr. Forrest's negligence.

Mr. Forrest argues he did not owe a duty to the Grabowskis because he is not a physician and did not actually perform Mrs. Grabowski's implant surgery.

11

He asserts that Dr. Collins is the "captain of the ship" in surgery and is solely responsible for insuring that the proper size implant was used on Mrs. Grabowski.

Pursuant to La.Civ.Code art. 2315(A), "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." If one fails to use reasonable care in his actions and causes damage to another, his actions are deemed negligent. *Meany v. Meany*, 94-251 (La. 7/5/94), 639 So.2d 229. There are four elements of negligence; they "include duty, breach, a causal relationship between the defendant's alleged negligent act and the plaintiff's injuries (which includes both cause in fact and legal cause), and damages." *Id.* A plaintiff who brings a negligence claim must prove these four elements to recover from a defendant. *Id.* Accordingly, whether the defendant owed the plaintiff a duty must be determined at the outset. *Id.* This is a legal question for the court to decide. *Id.* To answer this question, the court must determine "whether the plaintiff has any law–statutory, jurisprudential, or arising from general principles of fault–to support his claim." *Faucheaux v. Terrebonne Consol. Gov't,* 615 So.2d 289, 292 (La.1993).

In *Bonds v. SAPA Extrusions, LLC*, 48,760, p. 4 (La.App. 2 Cir. 2/26/14), 135 So.3d 799, 802 (citations omitted), *writ denied*, 14-667 (La. 5/2/14), 138 So.3d 1249, the court explained the process for determining whether a duty is owed:

> In deciding whether to impose a duty in a given case, the court must make a policy decision in light of the unique facts and circumstances presented. In *Meany v. Meany*, 94-0251 (La.07/05/94), 639 So.2d 229, 233, the Louisiana Supreme Court determined that certain policy considerations are to be taken into account in analyzing whether a duty is owed, stating:
>
>> In determining whether to impose a duty in a particular situation, the court may consider various moral, social, and economic factors, including whether the imposition of a duty would result in an unmanageable flow of

litigation; the ease of association between the plaintiff's harm and the defendant's conduct; the economic impact on society as well as the economic impact on similarly situated parties; the nature of the defendant's activity; moral considerations, particularly victim fault; and precedent as well as the direction in which society and its institutions are evolving.

Further, Professor Crawford has noted that the notion of duty used by Louisiana courts is identical to the duty articulated in *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 162 N.E. 99 (N.Y.1928), where duty is viewed "as necessarily contemplating the person or interest to whom the alleged duty was owed. If the injured party were unforeseeable to the defendant, then no duty of care existed because as a matter of definition one owes no duty to that which is unforeseen." William Crawford, Louisiana Civil Law Treatise, Tort Law, § 4:2, p. 91 (2009).

In *Milbert v. Answering Bureau, Inc.*, 13-22 (La. 6/28/13), 120 So.3d 678, the supreme court addressed the issue of whether a duty was owed in a context similar to the one presented here: can a health care provider and a non-health care provider each owe a duty to the plaintiff patient and be joint tortfeasors for harm the plaintiff patient suffered? The plaintiffs in *Milbert* sued a physician answering service, alleging the service's failure to inform the appropriate physician of a message left by the plaintiff patient regarding his complaints and symptoms when his physician's office was closed resulted in a serious worsening of the plaintiff patient's condition that his physician was treating. After not being contacted by his physician or the physician on call, the plaintiff patient sought treatment at an emergency room where the staff failed to properly evaluate and treat his condition.

As here, the non-health care provider defendant in *Milbert* argued that it could not be a joint tortfeasor with a health care provider as a matter of law because it did not owe the same duties to the plaintiff patient that the defendant health care providers owed him. In addressing the issue, the supreme court determined that the defendant answering service "had a duty to act as a reasonable

13

physician answering service" which duty required at a minimum "accurately obtaining and recording the messages from its clients' patients, some of whom may have recently undergone surgery, and accurately and promptly communicating such messages to the appropriate treating physician or physician on-call." *Id.* at 688. Consequently, the court found that it is not "unreasonable to expect that a physician answering service's duties would include the risk that a delay or inaccuracy in conveying a message from one of its clients' patients could result in a medical emergency or the worsening of a patient's medical condition." *Id.* Specifically, the supreme court held that the answering service's alleged negligence "necessarily included the foreseeable risk that its failure to contact an on-call doctor for an emergency situation could encompass subsequent negligent delay in his treatment by the hospital's nurses and emergency room physicians." *Id.*

Addressing the issue from the perspective of joint tortfeasors, the supreme court explained (footnotes omitted):

> "A joint tortfeasor is one whose conduct (whether intentional or negligent) combines with the conduct of another so as to cause injury to a third party." *Greer v. Johnson,* 37,655 p. 5 (La.App. 2 Cir. 9/24/03); 855 So.2d 898, 901. The term "joint tortfeasor" may be applied both to the situation where two or more persons are acting together in concert, or where "[t]he negligence of concurrent tortfeasors . . . occurs or coalesces contemporaneously," to produce an injury. [Frank L. Maraist & Thomas C. Galligan, Jr., Louisiana Tort Law § 12.04, at 12–6 (2004).] When joint tortfeasors conspire to commit an intentional or willful act, they are solidarily liable for the damage they cause. If liability is not solidary for damages caused by joint tortfeasors because the actions are not intentional or willful, then liability for damages caused by two or more persons is a joint and divisible obligation. Under Louisiana's pure comparative fault system, "the fault of every person responsible for a plaintiff's injuries [must] be compared, whether or not they are parties, regardless of the legal theory of liability asserted against each person." *Dumas v. State*

> *ex rel. Dept. of Culture, Recreation & Tourism,* 2002–0563, p. 11 (La.10/15/02); 828 So.2d 530, 537; *see* La. C.C. art. 2323.

*Id*. at 688-689.

To avoid having to maintain an inventory of such medical devices, West Cal and other hospitals allow sales representatives, such as Mr. Forrest, to attend surgeries and provide medical devices required by different doctors for various surgeries. The day of surgery, Mr. Forrest brought with him different sizes of the Genesis II knee implant that Dr. Collins might need for Mrs. Grabowski's knee replacement because the proper size implant required could not be determined until surgery was being performed.

Mr. Forrest had been providing implants to Dr. Collins and other doctors at West Cal and another local hospital for approximately three years prior to the July 2007 replacement of Mrs. Grabowski's left knee. Dr. Collins testified that the procedure followed during implant surgeries at West Cal and another local hospital in July 2007 was: the doctor performed a sizing trial to determine the appropriate size of the implant required for the surgery then stated the size implant needed; the sales representative retrieved the required implant in the size called out by the doctor; the sales representative opened the box containing the implant and delivered it to the circulating nurse who in turn delivered it to the doctor or his surgical assistant/nurse in a manner that insured the implant remained sterile until it was received within the sterile field. Dr. Collins further testified that the procedure utilized at West Cal was the customary procedure followed through his training and thereafter in every facility that he had ever been in and that the representative was present to help with things related to implants, including the handing off of the required implants.

15

Kristal Connor, Director of Surgical Services at West Cal, corroborated Dr. Collins' explanation of the OR procedure utilized during implant surgeries as of July 18, 2007. She described the procedure employed at West Cal in implant surgeries: the doctor stated what implant he needed; the sales representative retrieved the stated implant from his supply and brought it into the OR and opened the outer unsterilized portion of the packaging before handing it over to a circulating nurse. Mrs. Connor further testified that West Cal had no written policy on this practice; however, there was an understanding of the procedure to be followed that was known by the OR staff and sales representatives. She agreed that the procedure was the "normal day-to-day operations of the West-Cal O.R."

Mrs. Connor stated that West Cal's policy considered the sales representative as a "resource regarding the representative's products" who would provide the implant devices being used and also assist in troubleshooting with a complication or something else that may have gone wrong. She testified that the sales representatives are the experts with regard to the devices they represent and sell. She clarified that the sales representatives do not assist in the medical care of the patients, but they are the experts with regard to "everything it takes to do a particular procedure" utilizing the devices they sell.

Mr. Forrest had a duty to act as a reasonable sales representative. Dr. Collins' and Mrs. Connor's testimonies established that a reasonable medical sales representative at West Cal attended implant surgeries to provide the products he sold and his technological assistance to doctors performing surgery and that his duties included providing the surgical team the proper size implant components as determined by the surgeon.

16

Considering the factors outlined by the supreme court in *Meany*, 639 So.2d 229 and the testimonies of Dr. Collins and Mrs. Connor, we find Mr. Forrest had a duty to provide the appropriate size poly insert for the size 5 implant that Dr. Collins determined Mrs. Grabowski required. We do not see that imposition of this duty will result in an unmanageable flow of litigation. There is a clear association between the harm to Mrs. Grabowski and Mr. Forrest's conduct. Moreover, the nature of Mr. Forrest's activities, his experience, and his expected conduct in the OR made it clearly foreseeable that his failure to provide the proper size implant and corresponding poly insert would result in harm to the patient in whom it was being implanted. Mrs. Grabowski was not at fault. The economic impact is that all parties that contributed to Mrs. Grabowski's harm share in the responsibility for her damages. Surgeries, especially ones like Mrs. Grabowski's, are becoming more and more technologically advanced, requiring technological assistance from sales representatives who are specially educated and trained with respect to the medical devices they sell. Accordingly, it is reasonable for these sales representatives to be responsible for their negligent acts.

Mr. Forrest testified that he did not recall if he handed the poly insert to the OR personnel or simply opened two or three different sized implants and poly inserts and left them available on a table in the OR while he went to and from other surgical suites. Under the facts of this case, the determination of whether Mr. Forrest's actions combined with actions or inactions of Dr. Collins and the West Cal OR staff to cause injury to the Grabowskis such that he is a joint tortfeasor with the health care providers is a question of material fact that must be resolved by the trier of fact at a trial.

17

The defendants supported their Motion for Summary Judgment with the affidavit of Dr. William Cenac, an orthopedic surgeon in New Iberia, Louisiana, who averred that the procedure described by Dr. Collins and followed by West Cal with regard to implant surgeries is below the standard of care. Dr. Cenac supported his affidavit with statements published by the American College of Surgeons dated May 2000 and Association of Registered Nurses regarding the role of health care industry representatives (HCIR), such as Mr. Forrest, in the perioperative setting.

Pursuant to *Milbert*, 120 So.3d 678, the fact that these publications provide, in part, that HCIRs are not part of the perioperative team and their activities should be monitored does not preclude an HCIR from being responsible for his failure to provide the proper size of a medical device when that HCIR has been told the proper size of the device required and he knows, and has been subject to, procedures such as those followed in the OR at West Cal and another local hospital in which he sells medical devices and provides assistance during surgery for those medical devices. Therefore, the issues raised by Dr. Cenac's affidavit create genuine issues of material fact that preclude summary judgment in favor of Mr. Forrest; the grant of summary judgment in favor of Mr. Forrest is reversed.

### *Do Smith & Nephew and PUREPLAY Owe a Duty to the Grabowskis?*

The Grabowskis assert that the trial court erred in granting summary judgment in favor of Smith & Nephew and PUREPLAY. They argue that the contracts among the defendants create a *stipulation pour autrui* or third party beneficiary contract in their favor and that the relationships among the defendants clothed Mr. Forrest with apparent authority to act on their behalf thereby rendering them liable for his negligent acts. They also argue that even if Mr. Forrest is

18

neither an employee of Smith & Nephew nor PUREPLAY, they can be liable for his negligent acts.

### *Stipulation pour autrui*

Louisiana Civil Code Article 1978 provides: "A contracting party may stipulate a benefit for a third person called a third party beneficiary." Our jurisprudence has developed three criteria for determining whether contracting parties have provided a benefit for a third party. *Joseph v. Hosp. Serv. Dist. No. 2 of Parish of St. Mary*, 05-2364 (La. 10/15/06), 939 So.2d 1206. It must be clear that the claimed benefit is stipulated for the benefit of a third party; it must be certain "as to the benefit provided the third party;" and the benefit cannot be "a mere incident of the contract between the promisor and the promisee." *Id.* at 1212. Review of the criteria must establish that the contract "stipulate[s] a benefit for a third person," as required by La.Civ.Code art. 1978. *Id.* A *stipulation pour autrui* is never presumed, and the party claiming to benefit of a *stipulation pour autrui* bears the burden of proving it. *Id.*

The Grabowskis contend that language in two provisions of the contract between Smith & Nephew and PUREPLAY create a *stipulation pour autrui* that benefits them. The first provision states, in part: "Smith & Nephew shall indemnify its agents or employees . . . against any and all third party claims and demands for losses, damages and injuries." The second provision states:

> Territory Manager shall indemnify and hold harmless S&N and its affiliates and their agents and employees from and against all claims, damages, losses, and expenses . . . arising out of any breach of this Agreement, any negligence, or any other misconduct, on the part of Territory Manager or its agents or employees.

19

A reading of the first provision in its entirety shows it is not a *stipulation pour autrui* and that it does not benefit the Grabowskis. The provision states, in pertinent part:

> Smith & Nephew shall indemnify its agents or employees . . . against any and all third party claims and demands for losses, damages and injuries arising out of any claim of a defect in the manufacture or design of a Product or written representation or omission in S&N's promotional literature concerning the Product.

Rather than providing a benefit to a third party, like the Grabowskis claim, this provision clearly limits indemnification to Smith & Nephew's agents or employees and no one else. Furthermore, it provides indemnification for claims "arising out of any claim of defect in manufacture or design or written representation of omission," and the Grabowskis have neither asserted nor shown that their claims satisfy these criteria.

The second provision also does not provide a *stipulation pour autrui* because the relief provided therein is specific and personal to Smith & Nephew, its affiliates, their agents, and employees.

The distinction between these two provisions and a *stipulation pour autrui* is evident when they are compared to contract provisions that do benefit the third party seeking to enforce it. In *Duck v. Hunt Oil Co.*, 13-628 (La.App. 3 Cir. 3/5/14) 134 So.3d 114, *writs denied*, 14-703, 14-709, 14-715, 14-735 (La. 6/13/14), 140 So.3d 1189, 1190, another panel of this court determined that a contract providing, in pertinent part: "Lessee shall be responsible for all damages caused by Lessee's operations," was a *stipulation pour autrui* that benefitted a subsequent purchaser of the property affected by the lease. In reaching that conclusion, the panel considered other contractual provisions that had been held to be stipulations in favor of third parties, e.g., "Grantee shall be responsible for all

20

damages caused by his operations[,]" *Hazelwood Farm, Inc. v. Liberty Oil & Gas Corp.*, 01-345, 1 (La.App. 3 Cir. 6/20/01), 790 So.2d 93, 95, *writ denied*, 01-2115 (La. 7/26/01), 794 So.2d 834; and "The lessee shall be responsible for all damages caused by lessee's operations." *Andrepont v. Acadia Drilling Co.,* 255 La. 347, 231 So.2d 347, 348 (1969).

The deciding factor for the court in *Duck*, 134 So.3d 114, was the fact that the damage clauses in *Hazelwood*, *Andrepont*, and therein did not restrict liability to only the damages suffered by the lessors or the parties to the contracts. The provisions relied upon by the Grabowskis restrict liability for indemnification to Smith & Nephew's agents or employees and to Smith & Nephew, its affiliates, their agents, and employees. Accordingly, neither provision is a *stipulation pour autrui* that benefits them.

### Apparent Authority

The Grabowskis also contend that Mr. Forrest had the apparent authority of Smith & Nephew to act on their behalf; therefore, Smith & Nephew and PUREPLAY are individually liable for his acts of negligence. This argument is based on La.Civ.Code art. 3021 which provides: "One who causes a third person to believe that another person is his mandatary is bound to the third person who in good faith contracts with the putative mandatary."

The Louisiana Supreme Court outlined the concept of apparent authority in *Tedesco v. Gentry Development, Inc.*, 540 So.2d 960, 963 (1989) (citations and footnotes omitted):

> Apparent authority is a doctrine by which an agent is empowered to bind his principal in a transaction with a third person when the principal has made a manifestation to the third person, or to the community of which the third person is a member, that the agent is authorized to engage in the particular transaction, although the

21

principal has not actually delegated this authority to the agent. In an actual authority situation the principal makes the manifestation first to the agent; in an apparent authority situation the principal makes this manifestation to a third person. However, the third person has the same rights in relation to the principal under either actual or apparent authority. Further, apparent authority operates only when it is reasonable for the third person to believe the agent is authorized and the third person actually believes this.

. . . .

Louisiana courts have utilized the doctrine of apparent authority to protect third persons by treating a principal who has manifested an agent's authority to third persons as if the principal had actually granted the authority to the agent.

Pursuant to the apparent authority doctrine, "an agency relationship may be formed even without the intent to do so." *Lifetime Constr., L.L.C. v. Lake Marina Tower Condo. Ass'n, Inc.,* 12-487, 12-488, p. 7 (La.App. 4 Cir. 3/27/13), 117 So.3d 109, 115. The application of this principle of estoppel is considered "both fair and equitable to govern mutual rights and liabilities by the apparent scope of an agent's authority because third persons, who are not privy to the actual terms of the agency agreement, must rely entirely upon the indicia of authority with which the agent is vested." *Broadway v. All-Star Ins. Corp.*, 285 So.2d 536, 538 (La. 1973).

The party seeking to bind the principal has the burden of proving apparent authority. *Eakin v. Eakin*, 07-693 (La.App. 3 Cir. 12/19/07), 973 So.2d 873. When determining whether a principal's actions have created an apparent agency, courts must consider the evidence from the vantage point of the third party. *Verstichele v. Marriner,* 04-354 (La.App. 3 Cir. 9/29/04), 882 So.2d 1265.

In *Independent Fire Insurance Co. v. Able Moving and Storage Co., Inc.*, 94-1982 (La. 2/20/95), 650 So.2d 750, the supreme court determined that a national moving company, Bekins, clothed Able Moving and Storage Co., Inc., a

22

moving company operating in Baton Rouge, with actual and apparent authority to conduct business on its behalf. Facts considered by the court as showing that Able had Bekins' apparent authority to operate on its behalf as a moving company were: 1) Bekins published and paid for an advertisement which gave the erroneous impression that third parties dealing with Able were actually dealing with Bekins; 2) the plaintiff responded to a Bekins ad and testified that the telephone must have been answered by a person purporting to represent Bekins; 3) the movers arrived in a van marked with Bekins' name, wearing hats and shirts with Bekins' logo; and 4) the plaintiff's check was made out to Bekins. Moreover, the plaintiff testified that she believed throughout that she was dealing with Bekins. The supreme court held that because the plaintiff reasonably relied on representations that she was dealing with Bekins, Bekins was responsible for the Able's employee's negligence.

The Grabowskis point out that PUREPLAY provided Mr. Forrest business cards with his name as Smith & Nephew's representative. Pursuant to Smith & Nephew's contract with PUREPLAY, Smith & Nephew had to consent in writing to all advertising and participation in public exhibitions relating to its products, including the use of its name and its trademark. Mr. Forrest testified that he had to have a Smith & Nephew badge to enter the OR. Dr. Collins' testimony shows he believed that Mr. Forrest represented Smith & Nephew. Dr. Collins opined that Smith & Nephew was responsible for Mr. Forrest's actions because it did not properly train him.

The Grabowskis further argue that PUREPLAY's contract was not known to them or to others who dealt with Mr. Forrest; therefore, third parties had no way of knowing that Mr. Forrest was not representing Smith & Nephew. The Grabowskis also argue that Mr. Forrest was not identified by Smith & Nephew as an

23

independent contractor such that they or any other persons who purchased implants from him would know he was not an agent of Smith & Nephew but an independent contractor. These facts are sufficient to create a genuine issue of material fact as to whether Mr. Forrest had apparent authority to act for Smith & Nephew. Accordingly, the grant of summary judgment in favor of Smith & Nephew is reversed.

### *Independent Contractor*

The trial court held that because PUREPLAY's contract with Mr. Forrest identified him as an independent contractor PUREPLAY had no responsibility for his actions.

Pursuant to La.Civ.Code art. 2320, employers are answerable for the damage occasioned by their employees "in the exercise of the functions in which they are employed." For an employer to be held liable under Article 2320, "the plaintiff must show that (1) a master-servant relationship existed between the tortfeasor and the employer, and (2) the tortious act of the tortfeasor was committed within the scope and during the course of his employment with the employer." *Hughes v. Goodreau*, 01-2107, pp. 5-6 (La.App. 1 Cir. 12/31/02), 836 So.2d 649, 656, *writ denied*, 03-232 (La. 4/21/03), 841 So.2d 793.

Louisiana Revised Statutes 23:1021(7) defines "[i]ndependent contractor," in part, as "any person who renders service, other than manual labor, for a specified recompense for a specified result either as a unit or as a whole, under the control of his principal as to results of his work only, and not as to the means by which such result is accomplished."

The fact that a contract delineates an individual as an independent contractor is not the only factor in determining whether that individual is an employee or

independent contractor. *McGrew v. Quality Carriers, Inc.*, 11-440 (La.App. 3 Cir. 10/5/11), 74 So.3d 1253. The supreme court addressed independent contractor status in *Hickman v. Southern Pacific Transport Co.*, 262 La. 102, 117-18, 262 So.2d 385, 390-91 (La.1972) (emphasis added) (citations omitted), stating:

> It is well understood by the courts of this State that the term independent contractor connotes a freedom of action and choice with respect to the undertaking in question and a legal responsibility on the part of the contractor in case the agreement is not fulfilled in accordance with its covenants. The relationship presupposes a contract between the parties, the independent nature of the contractor's business and the nonexclusive means the contractor may employ in accomplishing the work. Moreover, it should appear that the contract calls for specific piecework as a unit to be done according to the independent contractor's own methods, without being subject to the control and direction, in the performance of the service, of his employer, except as to the result of the services to be rendered. It must also appear that a specific price for the overall undertaking is agreed upon; that its duration is for a specific time and not subject to termination or discontinuance at the will of either side without a corresponding liability for its breach.

> The law further recognizes that inquiry to determine whether a relationship is that of independent contractor or that of a mere servant requires, among other factors the application of the principal test: the control over the work reserved by the employer. *In applying this test it is not the supervision and control which is actually exercised which is significant, the most important question is whether, from the nature of the relationship, the right to do so exists.*

PUREPLAY's contract with Mr. Forrest is for a term of one year with a provision that it can be renewed for one-year periods which periods shall automatically renew if either party fails to provide written notice to the other of their election not to renew the agreement. The contract also provides: "Notwithstanding, [the automatic renewal provision], this Agreement may be terminated at any time prior to May 31, 2008, May 31, 2009 or May 31, 2010, pursuant to Section 8 of this Agreement." Section 8 identifies seven grounds for PUREPLAY to terminate Mr. Forrest.

25

The contract further provides that Mr. Forrest is an independent contractor responsible for essentially all expenses associated with his sales and marketing activities, including travel, and food, lodging; payment of his own taxes and insurance; costs associated with meeting physicians, sales meetings, and conventions; telephone expenses; home office expenses; automobile expenses; discounts taken by customers or allowed by him that are not approved by PUREPLAY; office equipment; loss or damage to any products, samples, implants and/or instrumentation; and literature, promotional materials, and catalogue costs in excess of an annual amount provided by PUREPLAY. The contract also delineates Mr. Forrest's and PUREPLAY's obligations under the contract and provides for Mr. Forrest to be paid commissions which are based on sales and calculated as provided in the contract.

The Grabowskis argue that pursuant to its contract, PUREPLAY has the right to control enough aspects of Mr. Forrest's work that a genuine issue of material fact exists as to whether or not PUREPLAY is his employer. The contract does not provide how Mr. Forrest is to conduct his sales meetings or which doctors he must contact. The contract does, however, identify and limit the area in which he can solicit sales; set performance standards; require him to be true, accurate, and complete in his communications regarding the products he sells; provide he will not modify or alter packaging or labeling of the products he sells; provide that he will act in compliance with all laws, rules, and regulations, and not enter any agreement on behalf of PUREPLAY.

The contract also provides that Mr. Forrest will not enter into a relationship with any company that competes with PUREPLAY and will not share trade secrets or confidential information. Moreover, the contract also provides that Mr. Forrest

will submit all product ideas he receives from his customers and that such ideas developed or discovered by him "are and shall remain the sole property" of PUREPLAY because it provided him "with special knowledge and has placed him in a position to formulate ideas concerning products." By the terms of the contract, Mr. Forrest "assigns such ideas to PUREPLAY and hereafter shall acquire no right or interest in such ideas." The contract does not include a provision that it is "not subject to termination or discontinuance at the will of either side without a corresponding liability for its breach," as contemplated by *Hickman*, 262 La. at 117, 262 So.2d at 391.

The Grabowskis cite *Webb v. Roofing Analytics, LLC,* 48,248 (La.App. 2 Cir. 7/24/13), 121 So.3d 756, as support for their position that a genuine issue of material fact exists as to whether Mr. Forrest is an independent contractor or an employee. In *Webb*, a salesman sued for non-payment of wages after he ended his employment with the defendant. The defendant denied owing the plaintiff wages on the basis that he was an independent contractor. The contract in *Webb* contained specific provisions for an increase in the salesman's commissions; his business cards identified him as an insurance claims specialist with the defendant, rather than an independent contractor; and outlined actions, such as failure to return customer calls or emails, that could lead to "negative counseling" and "hinder advancement." The contract did not provide for "specific piecework as a unit," did not provide a specific price, and had no agreed upon time or duration for such work. Additionally, neither party was subject to liability for breach upon termination of their relationship.

The court in *Webb* noted, "In addition to the power of control, other factors indicative of an employer-employee relationship include selection and

27

engagement, the payment of wages, and the power of dismissal." *Id*. at 764. The court further observed, "Notably, our courts have regarded commissioned salespeople as employees, not as independent contractors." *Id*.

Our review of PUREPLAY's contract leads to the conclusion that genuine issues of material fact exist as to whether Mr. Forrest is an employee and not an independent contractor, including the payment of commissions for his sales, the number of causes for termination of Mr. Forrest, the lack of consequences in the event PUREPLAY breaches the contract, and the ownership of Mr. Forrest's product ideas without evidence of what training PUREPLAY provided Mr. Forrest that equipped him with special knowledge needed to formulate product ideas. For these reasons, the grant of summary judgment in favor of PUREPLAY is reversed.

## DISPOSITION

Finding no error with the trial judge's failure to act on the Grabowskis' Motion to Substitute Counsel and Motion for Recusal, the writ application is denied. The judgment of the trial court granting the Motion to Close the Record is affirmed. The grants of summary judgment in favor of Daniel Forrest, Smith & Nephew, Inc., and PUREPLAY Orthopaedic Sales 1 Ltd. are reversed, and the matter is remanded to the trial court for further proceedings. Costs of the writ application are assessed to the Grabowskis. Costs of the appeal are assessed to Smith & Nephew, Inc., PUREPLAY Orthopaedic Sales 1 Ltd., and Daniel Forrest.

**WRIT DENIED. JUDGMENT AFFIRMED IN PART; REVERSED IN PART; AND REMANDED FOR FURTHER PROCEEDINGS.**